UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | CRIMINAL NO. 03-10329-PBS |
| AMANDO MONTEIRO, | ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM AND ORDER**

October 31, 2005

SARIS, U.S.D.J.

## I. INTRODUCTION

Defendant Amando Monteiro moves for numerous remedies based on the government's failure to fulfill its obligations to disclose exculpatory evidence under Brady v. Maryland, 373 U.S. 83 (1963), Local Rule 116.2, and two orders from Magistrate Judge Collings (Docket entry for 9/20/04, referencing and renewing Order given on 6/24/04).

After hearing on September 15, 2005, the Court **DENIES** the defendant's motion to dismiss (Docket No. 925), and **ALLOWS**, in part, the defendant's motion for sanctions and discovery (Docket No. 926).

## II. FACTUAL BACKGROUND

On October 23, 2003, defendant Angelo Monteiro was indicted, along with twelve others, for violations of the Racketeer

1

Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et. seq.*, related to his alleged membership in a violent street gang known as Stonehurst or the Stonehurst Street Crew that operated out of several areas of Massachusetts and Rhode Island. This original indictment did not include any allegations related to the shooting of Dinho Fernandes, which occurred on March 17, 1999.

The government continued its investigation of the Fernandes shooting after the original indictment had issued.  Eventually, United States Magistrate Judge Robert Collings required the government to notify defense counsel by August 24, 2004 of whether it planned either to include any charges or to introduce evidence related to Fernandes killing in their case-in-chief.  If the government did plan to introduce evidence of the Fernandes killing, it was ordered to produce all discovery to which the defendants were entitled under the Local Rules.  (Docket entry for 6/24/04.)  On August 24, the Assistant United States Attorney handling the case indicated in a letter that the government planned to supersede the original indictment to add charges related to the Fernandes killing, but he refused to disclose any evidence regarding the killing.  (Docket No. 272.)

Magistrate Judge Collings responded to the government's actions at a September 20, 2004 status conference, stating that "[t]he conduct of the Assistant U.S. Attorney assigned to this

case is coming perilously close to being contumacious . . . . This is a totally unacceptable manner of proceeding and will not be tolerated."  (Docket entry for 9/20/04.)  Magistrate Judge Collings ordered the government to provide by September 30, 2004 all discovery related to the Fernandes murder to which the defendants were entitled under the Local Rules, which require any exculpatory evidence to be disclosed within twenty-eight days of arraignment.  The order concluded with the warning that "[d]isobedience and/or failure to comply with the within Order may result in a prosecution of the responsible Assistant U.S. Attorney for contempt of court and/or the imposition of other sanctions against the Government."  (Docket entry for 9/20/04.)

Per Magistrate Judge Collings's order, the government produced a significant amount of material related to the Fernandes killing on September 27, 2004, including documents from state and local investigations of the crime.  As discussed later in this opinion, however, this disclosure was incomplete under the Local Rules.

On September 30, 2004, the grand jury amended the indictment to include allegations related to the death of Dinho Fernandes. Count Thirty-three of the First Superseding Indictment ("the superseding indictment") alleges that Monteiro and co-defendants Angelo Brandao and Luis Rodrigues, as part of a continuing criminal enterprise engaged in racketeering, murdered Fernandes.

(Superseding Indictment at 63.)  The grand jury further alleged that it was Monteiro who shot and killed Fernandes.  (Superseding Indictment at 67.)  The government bases its allegation that Monteiro shot Fernandes largely on testimony from Augusto Lopes, a cooperating witness.  (Gov't Opp'n to Mot. to Dismiss at 1.)  Lopes testified to the grand jury in early 2004 that he provided Monteiro with a firearm, drove him to the location of the murder, and watched Monteiro shoot and kill Fernandes.  (Id. at 1-2.)

Three months later, on January 25, 2005, the government supplemented its discovery with additional documents from the file of the Plymouth County District Attorney.  Included in these supplemental materials was a December 28, 1999 interview with another person claiming to be an eyewitness ("Eyewitness #2") to the Fernandes killing.  Eyewitness #2 asserted that he had been with Fernandes at the time of the shooting and that he saw Angelo Brandao pull the trigger.  The government's disclosure came eleven weeks before Monteiro's originally scheduled trial date of April 12, 2005.  For unrelated reasons, the trial date has been continued until January 2006.

In September and October of 2004, the government was engaged in the process of deciding whether to seek the death penalty against Monteiro. See United States Attorneys' Manual, §9-10.020 (June 7, 2001). Under Department of Justice procedures, defense counsel is entitled to make submissions to both the U.S. Attorney and the Department, arguing that the Attorney General's

discretion should be exercised against seeking the death penalty. Id. at §§ 9-10.030, 9-10.050.  On October 25, 2004, without knowledge of Eyewitness #2's assertion that he saw Brandao kill Fernandes, counsel for Monteiro argued before the Capital Case Review Committee at the Department of Justice that the government should not attempt to obtain a death sentence against Monteiro. The United States Attorney recommended against seeking the death penalty.  The Attorney General elected not to pursue the death penalty against Monteiro.  Notice was filed on January 18, 2005.

Monteiro filed this motion on June 30, 2005, alleging that the government's failure to disclose this additional material violated the Magistrate Judge's order, Local Rule 116.2, and Monteiro's due process rights under Brady.  Based on these alleged violations, Monteiro moves to dismiss the entire indictment, or at least the charges related to the Fernandes shooting.  Alternatively, Monteiro suggests a host of other remedies, including expanded discovery and sanctions against the government.

At a hearing before this Court regarding this matter on September 15, 2005, the government admitted that it should have disclosed this evidence within the time limits established by the Local Rules, but insisted that its error was inadvertent. Defense counsel agreed that the omission was the result of negligence and not bad faith on the part of the Assistant U.S. Attorney. (Mot. Hr'g Tr. 42, Sept. 15, 2005.)

The Court **DENIES** the motion to dismiss, but it **ALLOWS** in part the motion for discovery and sanctions.

### III. DISCUSSION

**A.   The Alleged Discovery Violations**

Monteiro alleges three discovery violations by the government: violations of its Brady obligations, the Local Rules, and the Magistrate Judge's orders.  The Court will address these in turn and then consider the appropriate remedy.

   1.   Violation of Brady

Monteiro argues that the prosecution violated his Fifth Amendment right to due process as stated in Brady v. Maryland, which held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.  There is no dispute that the defendant requested the evidence, or that the statements of Eyewitness #2 to the effect that Brandao, and not Monteiro, shot Fernandes are both exculpatory and material.  See Mot. Hr'g Tr. 31.  See also United States v. Agurs, 427 U.S. 97, 113 n.21 (1976) (stating that an eyewitness account fingering a person other than the defendant as the perpetrator would likely meet the standard of materiality). Failure to turn exculpatory statements over to the defense in a timely fashion does violate Brady.

2.   Violation of Local Rule 116.2

Local Rule 116.2(B)(1)(a) requires the government to turn over, within twenty-eight days of the indictment, any "[i]nformation that would tend directly to negate the defendant's guilt concerning any count in the indictment or information." Since the government has conceded that the statements of Eyewitness #2 are exculpatory information, the local rules required the government to turn over these statements to the defense by October 28, 2004.  Since the disclosure of the statements did not occur until January 25, 2005, the government violated Local Rule 116.2.  (However, as the government points out, the meeting with the Attorney General took place three days before the exculpatory evidence was due.)

3.   The Magistrate Judge's Orders

Magistrate Judge Collings twice ordered the government to disclose all discovery to which the defendants are entitled regarding the Dinho Fernandes murder by specific deadlines, the last of which being September 30, 2004.  (Docket entries for 6/24/04 and 9/20/04.)  Since the government failed to produce the statements of Eyewitness #2 until January 25, 2005, it failed to comply with the Magistrate Judge's Orders.

**B.**   **The Remedy**

Although Monteiro has established several discovery violations by the government, the question remains as to what

should be the appropriate remedy.  "The district court has broad discretion to redress discovery violations in light of their seriousness and any prejudice occasioned the defendant."  <u>United States v. Josleyn</u>, 99 F.3d 1182, 1196 (1st Cir. 1996).  The Court also has discretion to shape the remedy based on the particular circumstances of the case.  <u>See</u> <u>United States v. Osorio</u>, 929 F.2d 753, 762 (1st Cir. 1991) ("The remedies applied by a court in a case of discovery violations will vary in proportion to the seriousness of the violation and the amount of prejudice suffered by the defendant in each case.").

In this case, the defendant has asked for dismissal of either the entire indictment or the charges related to the Fernandes killing.  Failing that, the defendant proposes a series of sanctions against the government.

    1.   Dismissal

Although the Court has broad discretion to remedy the discovery violations in this case, dismissal of serious charges including murder and shootings would be far too draconian a remedy.  The First Circuit has stated that dismissal should be used as a means to deter government misconduct only sparingly.  <u>See</u> <u>United States v. Santana</u>, 6 F.3d 1, 11 (1st Cir. 1993) (noting that courts should "refrain from using the supervisory power to conform executive conduct to judicially preferred norms by dismissing charges, absent cognizable prejudice to a particular defendant"); <u>see also</u> <u>Josleyn</u>, 99 F.3d at 1196

(favoring alternative remedies over dismissal when they would be "more consonant with the government's culpability and any prejudice to the defense").

In this case, while it is clear that the government did commit a discovery violation, there are several factors which weigh against dismissal.

First, the defense received the statements of Eyewitness #2 well in advance of the trial.  True, the late disclosure was eleven weeks prior to trial, but now that there have been two continuances, the defense will have had the material for a full eleven months before the beginning of the trial.  In a case of delayed disclosure, "the critical inquiry is not why disclosure was delayed, but whether the tardiness prevented defense counsel from employing the material to good effect."  United States v. Devin, 918 F.2d 280, 290 (1st Cir. 1990).  The First Circuit has counseled that in a case of delayed disclosure the district court must determine "whether the failure to supply the information in a seasonable fashion caused the defense to change its trial strategy."  United States v. Lemmerer, 277 F.3d 579, 588 (1st Cir. 2002) (quoting Josleyn, 99 F.3d at 1196).

In this case, the defendants received the material with ample time to incorporate it into their trial strategy.  In fact, the disclosure occurred with much more lead time than in many similar cases in which courts declined to dismiss indictments.  See Lemmerer, 277 F.3d at 588 (dismissal not required when

defense received exculpatory documents on the next-to-last day of trial because counsel was able to "incorporate them ably" in the existing defense); United States v. Cardales, 168 F.3d 548, 556 (1st Cir. 1999) (mistrial not necessary when defense learned of negative drug test on carpet of defendant's automobile during trial because counsel was able to use it in cross-examination); United States v. Richman, 600 F.2d 286, 292 (1st Cir. 1979) (disclosure four days prior to trial that government witnesses were paid informants did not warrant "the extraordinary relief of dismissal").

Second, the discovery violations were not the result of bad faith on the part of the Assistant U.S. Attorney, who had in fact urged the Attorney General not to pursue the death penalty. Moreover, he had produced a report of another witness who said that yet another person saw Brandao fire the gun. While Brady makes clear that the lack of bad faith by the prosecution does not excuse withholding exculpatory evidence, 373 U.S. at 87, that the government's delayed disclosure was unintentional in this case does counsel against dismissing the case to send a message to the government. See Josleyn, 99 F.3d at 1196 (affirming district court's decision not to dismiss when the defense made "no claim that the prosecutor intentionally delayed disclosure"). If anything, the prosecutor's error likely resulted from the United States Attorney's under-allocation of prosecutorial resources to this case. For months, only one Assistant United

States Attorney was assigned to this extremely complicated case involving thirteen defendants facing significant sentences if convicted. Moreover, he was the Assistant U.S. Attorney assigned to another murder trial running on parallel tracks in another session. Under these conditions, it is expected, indeed likely, that mistakes will happen, but while such circumstances may provide an explanation, they do not provide an excuse for failing to disclose exculpatory material.

In sum, given that the defense received the material with adequate time to incorporate the statements into its trial strategy, and that there was no bad faith on the part of the prosecutor, dismissal would be too extreme a response to these discovery violations. See Josleyn, 99 F.3d at 1196 (finding that the "draconian relief" of dismissal was "grossly disproportionate to the prosecutor's nonfeasance and any prejudice to the defense.").

   2.   Discovery Sanctions

Defendant argues that, should the Court choose not to dismiss the charges against Monteiro, other alternatives are available to redress the government's admitted discovery violations.

The most significant issue in this case is that defense counsel was forced to argue that the Attorney General should not seek the death penalty without the benefit of significant exculpatory evidence. The United States Attorney's Manual

provides that in death penalty-eligible cases the Attorney General makes the ultimate decision whether or not to seek the death penalty.  <u>See</u> United States Attorney's Manual, § 9-10.020.  As part of the decision-making process, the protocol allows defense counsel "a reasonable opportunity to present any facts, including any mitigating factors, to the United States Attorney for consideration."  <u>Id.</u> at § 9-10.030.  Defense counsel in this case made these submissions and argued orally before the Capital Case Review Committee without the benefit of knowledge that a purported eyewitness stated to police that someone other than Monteiro pulled the trigger and killed Dinho Fernandes.

As the First Circuit recognized, "the reality is that once a determination by the Attorney General is made to seek the death penalty, the incentive for defendant to plead guilty in exchange for a term of imprisonment is obvious. . . ."  <u>In re Sterling-Suarez</u>, 306 F.3d 1170, 1172 (1st Cir. 2002).  For that reason, "learned counsel is to be appointed reasonably soon after the indictment and prior to the time that submissions are to be made to persuade the Attorney General not to seek the death penalty."  <u>Id.</u> at 1173.  <u>See</u> 18 U.S.C. § 3005.  By depriving learned counsel of exculpatory evidence, defendant has been deprived of the "practical opportunity for learned counsel to persuade the Attorney General."  <u>Id.</u>

Courts differ regarding whether the government's decision-making process as to whether to seek the death penalty

12

constitutes a "critical stage" under the Sixth Amendment, and the First Circuit has declined to address the issue.  Compare United States v. Pena-Gonzalez, 62 F. Supp. 2d 358, 364 (D.P.R. 1999) (holding that the death penalty certification hearing is a "critical stage"), with United States v. Furrow, 100 F. Supp. 2d 1170, 1177 (C.D. Cal. 2000) (holding that the death penalty certification hearing is not a critical stage because the ultimate decision whether to seek the death penalty lies with the Attorney General).  Regardless of the constitutional debate, the failure to provide Brady material undercuts the statutory right to the meaningful assistance of learned counsel.

The government's response is essentially, "no harm, no foul."  However, the Court believes that a sanction is necessary and appropriate for a violation of the local rules and orders of the magistrate judge.  The government must disclose all materials in its files related to the Fernandes shooting.  To the extent a disclosure will jeopardize a witness's safety, the Assistant U.S. Attorney shall file an in camera affidavit documenting the issue.  The Assistant U.S. Attorney must sign an affidavit stating that he has consulted with all involved local, state, and federal law enforcement officers (and listing their names) to ensure that all available evidence related to the Fernandes homicide has been produced.  These affidavits shall be filed within two weeks.  Any correspondence, reports, or notes concerning Eyewitness #2 shall be produced within two weeks as well.

**ORDER**

The Court **DENIES** the motion to dismiss (Docket No. 924).

The Court **ALLOWS** in part, as detailed in this opinion, the motion for sanctions and discovery (Docket No. 925).

                                               **S/PATTI B. SARIS**
                                               United States District Judge